UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL** **“O”**

| Case No. | 2:17-cv-02014-CAS-AGRx | Date | April 2, 2018 |
|---|---|---|---|
| Title | MIKE L. IRELAND v. UNITED STATES OF AMERICA | | |

| Present: The Honorable | CHRISTINA A. SNYDER | |
|---|---|---|
| Catherine Jeang/John Lopez | Laura Elias | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Philip Panitz | Gavin Green |

**Proceedings:** DEFENDANT’S MOTION FOR SUMMARY JUDGMENT (Dkt. 22, filed February 12, 2018)

## I. INTRODUCTION

On March 14, 2017, plaintiff Mike L. Ireland filed the instant complaint against defendant United States of America (the “government”). Dkt. 1 (“Compl.”). Plaintiff contests a trust fund recovery penalty (“TFRP”) that was assessed against him pursuant to 26 U.S.C. section 6672 for unpaid trust fund taxes[1] from Micro Capital Limited Partnership (“Micro Capital”). Plaintiff asserts that he is entitled to a refund of $333,060.86, plus interest, resulting from his payment of the TFRP, and that he is entitled to abatement of unpaid employment taxes for the taxable periods ended 06/30/2008, 09/30/2008, and 03/31/2009. See Compl.

On February 12, 2018, the government filed a motion for summary judgment. Dkt. 22 (“MSJ”). On February 26, 2018, plaintiff filed an opposition, dkt. 26 (“Opp’n”). On March 2, 2018, defendant filed a reply, dkt. 27 (“Reply”), and submitted a response to plaintiff’s statement of genuine disputes of material fact, dkt. 28 (“Response”).

On April 2, 2018, the Court held oral argument. After considering the parties’ arguments, the Court finds and concludes as follows.

[1] Trust fund taxes consist of amounts withheld from employee’s wages for their income, Social Security, and Medicare taxes.

## II. BACKGROUND

The following facts are not meaningfully disputed and are set forth for purposes of background. Unless otherwise noted, the court references only facts that are uncontroverted and as to which evidentiary objections have been overruled.

### A. Plaintiff's Involvement with Micro Capital

Micro Capital was a limited partnership that operated under the name "Compel." Dkt. 22-1, Defendant's Statement of Uncontroverted Facts ("DSUF") at no. 26. Micro Capital had an office in Santa Fe Springs, California, and an office in Phoenix, Arizona. Id. at nos. 27–28. Micro Capital has two general partners: Micro-One Capital, LLC, and Micro Capital Corporation.[2] See Dkt. 22-5, Plaintiff's Response to Request for Admissions at 2.

Plaintiff was a 44% limited partner in Micro Capital. Dkt. 26-1, Plaintiff's Statement of Facts ("PSF") at no. 85; Dkt. 22-5, Plaintiff's Response to Request for Admissions at 3; Dkt. 22-6, Deposition of Mike L. Ireland ("Ireland Depo.) at 6:8-13.[3] In particular, plaintiff's primary role with Micro Capital was to help with sales and marketing, and upon request from Micro Capital's management team, meet with clients or potential clients in Phoenix. PSF at no. 86. Plaintiff's business card for Micro Capital listed his title as "Principal," and employees of Micro Capital sometimes referred to him as "the CEO." DSUF at nos. 7–8. However, plaintiff was not the Chief Executive Office or President of Micro Capital. PSF at nos. 87–88. Plaintiff attended Micro Capital executive meetings approximately two times a year, and did not have an office at Micro Capital. Id. at nos. 94; 113.

---

[2] Plaintiff states in his deposition that T.J. Pantaleo, part-owner of Micro Capital, was also the owner of Micro-One Capital, LLC. Plaintiff denies that plaintiff was the manager, officer, or director for Micro-One Capital, LLC or Micro Capital Corporation. Ireland Depo. at 7:4-11:19; 15:12-18. Moreover, while it appears that plaintiff and Pantaleo were each 44% limited partners in Micro Capital, it is unclear what their roles as limited partners were, and it is also unclear as to whether the general partners had any percentage interest in Micro Capital. The Court requested oral argument on this matter. At oral argument, the parties did not address this issue.

[3] Plaintiff works on a day-to-day basis at JKL Technologies, and has "always made investments in other business ventures." PSF at no. 112.

From July 2008, through June 2009, plaintiff lived in California. DSUF at no. 29. He traveled to Micro Capital's Arizona office approximately once per month to help with sales and marketing, and was in contact with Micro Capital's management by telephone on a monthly basis. Id. at nos. 30–31. Plaintiff participated in about half of the quarterly executive meetings. Id. at no. 32.

Micro Capital's ownership was divided in three ways: plaintiff owned a 44% limited partner interest; T.J. Pantaleo owned a 44% limited partner interest; and Silicon Valley Bank owned 12%. Id. at nos. 4–6; PSF at no. 89.

It is undisputed that Pantaleo was at all times actively involved in managing Micro Capital and was "much more familiar" with the books, records, and business of Compel when it was acquired by Micro Capital. PSF at nos. 90–91. Plaintiff invested in Micro Capital because he trusted Pantaleo's business acumen and expertise, and Pantaleo did all of the background work before Micro Capital decided to acquire Compel. Id. at nos. 99, 101.

Pantaleo was not only a partner in Micro Capital, he was also the legal counsel for the company. Id. at no. 104. Nate Miller was the Chief Financial Officer, and Pat Arvizu was the Controller. Id. These three individuals "had all of the financial and tax information concerning the company." Id. Miller hired Arvizu, and Arvizu reported to Miller. Id. at no. 114. Over a two-year period, Arvizu only saw plaintiff in the office approximately six times, and Arvizu never contacted plaintiff directly. Id. at nos. 115–116.

Plaintiff did not have firsthand knowledge of the day-to-day business at Micro Capital, and the information that he received came directly from Pantaleo or other executives running the company. Id. at no. 92. Moreover, plaintiff's knowledge concerning Micro Capital's business was generally limited to a verbal or written report from Pantaleo approximately once a month. Id. at no. 95. Plaintiff did not have the working knowledge of the company, its financials, its accounting department, or its tax obligations, though the parties dispute whether plaintiff was a "passive investor." Id. at no. 105.

It is undisputed that plaintiff was involved in the hiring and firing of Jason Crandall, the president of Micro Capital, and that this was the only hiring decision in which plaintiff ever participated. DSUF at nos. 17–18; PSF at no. 110.

On January 31, 2008, Micro Capital opened a Wells Fargo Bank account ending in 5755, and the business account application for this account lists plaintiff as CEO. DSUF at nos. 9–10. Plaintiff signed the business account application for account 5755. Id. at no. 80. On May 7, 2008, Micro Capital opened another Wells Fargo Bank account ending in 9397, and the business account application for this account listed plaintiff as CEO. Id. at nos. 11–12. Similarly, plaintiff is listed on the business account application as CEO for the Wells Fargo Bank account ending in 9405, which was opened on May 7, 2008. Id. at nos. 13–14. Plaintiff had signature authority for each of these Wells Fargo bank accounts. Id. at nos. 19–21.

Micro Capital obtained loans for its outstanding receivables from Rexford Funding, LLC ("Rexford"). Id. at no. 22. On February 21, 2008, plaintiff signed an agreement with Rexford, guaranteeing payment for the receivables (the "Guarantee"). Id. at no. 23. Under the Guarantee, payments from Micro Capital's customers were sent to Rexford, and Rexford advanced a portion of the weekly receivables to Micro Capital. Id. at no. 24. Micro Capital used the payments it received from Rexford to fund its operations. Id. at no. 25.

Though the parties dispute whether, as an owner of Micro Capital, all employees reported to plaintiff, the dispute appears to concern whether employees directly reported to plaintiff, or whether, all employees "effectively" reported to plaintiff vis-à-vis his status as part-owner. It is undisputed that plaintiff had some authority to tell employees of Micro Capital which creditors to pay, though the extent of this authority is unclear.

### B. Micro Capital's Employment Tax Liabilities

For the quarters ending June 30, 2008, September 30, 2008, and March 31, 2009, Micro Capital had employees but failed to withhold and pay the employees' portion of employment taxes. Id. at nos. 1–3. When Arvizu learned that payroll taxes were not being paid, she reported this to Miller. PSF at no. 117.

Plaintiff learned that Micro Capital was not paying its employment taxes to the Internal Revenue Service ("IRS") at some point in or after mid-2008, though the parties dispute precisely when this occurred.[4] When plaintiff learned that Micro Capital was not

[4] The government contends that plaintiff learned this information in "mid-2008," and plaintiff contends that he learned this information on or about August 25, 2008. Id. at no. 33; PSF at no. 33 (citing Deposition of Mike Ireland at 34:14–19).

paying its employment taxes, the unpaid liability was approximately $400,000. DSUF at no. 34. Plaintiff was not familiar with the "everyday decisions" at Micro Capital and does not know how those factors may have contributed to cash flow problems facing Micro Capital. PSF at no. 98.

It is undisputed that plaintiff had some power to control how Micro Capital resolved its unpaid employment tax liabilities, though the parties dispute to what extent plaintiff had this power. DSUF at nos. 16, 51; Ireland Depo. at 36:17–23;37:17–19. The parties also dispute whether plaintiff attempted to delegate his power to control how Micro Capital resolved its unpaid employment tax liabilities. It is undisputed that plaintiff trusted that others would pay the unpaid employment taxes to the IRS. DSUF at no. 53. Moreover, plaintiff was not involved in the day-to-day decision-making concerning which creditors were to be paid. PSF at no. 118.

During the twelve months after plaintiff learned about Micro Capital's tax delinquency, plaintiff received calls from Micro Capital executives requesting money from plaintiff—in particular, the executives requested approximately $1 million to pay Micro Capital's creditors. Id. at nos. 35–36. During this time, plaintiff provided approximately $1 million to Micro Capital, and specifically instructed that payment of the delinquent employment taxes was Micro Capital's first priority. DSUF at nos. 37–38; Response at 4. When additional amounts were requested from plaintiff, he demanded that the unpaid taxes be paid prior to the other vendors. PSF at no. 107.

Pantaleo, Miller, and Arvizu were the individuals directed to resolve these tax liabilities. Id. at no. 103. Despite plaintiff's money that he sent to Micro Capital's executives in order to pay the employment tax liabilities, the executives failed to pay these liabilities. Id. at no. 109.

For the quarter ending June 30, 2008, Micro Capital reported total taxes after adjustments of $230,364.91, total deposits of zero, and a balance due of $230,364.91. Id. at nos. 42–44. For the quarter ending September 30, 2008, Micro Capital reported total taxes after adjustments of $227,034.68, total deposits of zero, and a balance due of $227,034.68. Id. at nos. 45–47. For the quarter ending March 31, 2009, Micro Capital reported total taxes after adjustments of $104,456.60, total deposits of zero, a balance due of $104,546.60. Id. at nos. 48–50.

Micro Capital ceased operations in the second quarter of 2009. Id. at no. 55. The IRS received no payments for employment taxes for the quarters ending in June 30, 2008, September 30, 2008, and March 31, 2008, before Micro Capital ceased operations. Id. at no. 56. Plaintiff believes that, if he had been actively running Micro Capital and exercising his power to resolve the tax liability problem, the employment taxes would have been paid to the IRS. Id. at no. 57.

### C. Micro Capital's Post-Tax Liability Credits

In 2008 through June 2009, Micro Capital paid creditors other than the IRS after plaintiff first became aware that Micro Capital had failed to withhold certain employment taxes due to the IRS. Id. at nos. 58–64.

On December 29, 2008, Micro Capital issued a check to plaintiff for $2,500 from its Wells Fargo Bank account ending in 9405. DSUF at no. 39. On January 2, 2009, plaintiff deposited this check into his personal bank account at Bank of America. Id. at no. 40. Plaintiff "received several checks for $2,500 from Micro Capital."[5] Id. at no. 41.

For the month ending January 31, 2009 through the month ending June 30, 2009, the Wells Fargo Bank account ending in 9398 had the following credits and debits:

| **Month Ending:** | **Total Credits** | **Total Debits** | **Total Checks Paid** |
|---|---|---|---|
| January 31, 2009 | $303,622.12 | $312,724.55 | $163,024.55 |
| February 28, 2009 | $278,187.96 | $276,702.45 | $169,202.45 |
| March 31, 2009 | $244,368.72 | $243,698.32 | $114,098.32 |
| April 30, 2009 | $298,599.98 | $195,549.55 | $115,449.55 |
| May 31, 2009 | $583,819.61 | $695,147.95 | $309,235.95 |
| June 30, 2009 | $274,391.08 | $274,231.46 | $213,095.46 |

5 The parties do not state when, precisely, plaintiff received these additional checks, or whether plaintiff deposited them.

Id. at nos. 65–70.

For the month ending January 31, 2009 through the month ending June 30, 2009, the Wells Fargo Bank account ending in 9405 had the following credits and debits:

| **Month Ending:** | **Total Credits** | **Total Debits** | **Total Checks Paid** |
|---|---|---|---|
| January 31, 2009 | $297,001.25 | $285,467.67 | $176,713.45 |
| February 28, 2009 | $212,365.31 | $176,427.24 | $166,370.66 |
| March 31, 2009 | $213,559.48 | $258,105.57 | $237,096.38 |
| April 30, 2009 | $142,632.55 | $159,387.08 | $131,088.57 |
| May 31, 2009 | $430,925.31 | $427,353.98 | $173,245.74 |
| June 30, 2009 | $90,503.80 | $121,328.57 | $109,251.69 |

Id. at nos. 71–76.

For the quarter ending June 30, 2008, Micro Capital reported total taxes of $230,364.91 on Form 941, which was due on July 31, 2008, and was late filed when it was received by the IRS on November 3, 2008. Id. at no. 81. For the quarter ending September 30, 2008, Micro Capital reported total taxes of $227,034.68 on Form 941, which was due on October 31, 2008, and was late filed when it was received by the IRS on November 17, 2008. Id. at no. 82. For the quarter ending March 31, 2009, Micro Capital reported total taxes of $104,546.60 on Form 941, which was due on April 30, 2009, and was late filed when it was received by the IRS on July 13, 2008. Id. at no. 83.

On April 15, 2014, the IRS assessed the following trust fund recovery penalties against plaintiff: (1) $80,593.45 for the period ending June 30, 2008; (2) $157,691.40 for the period ending September 30, 2008; and (3) $71,885.80 for the period ending March 31, 2008. Id. at nos. 77–79.

## III. LEGAL STANDARD

### A. Summary Judgment

Summary judgment is appropriate where “there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.” Fed. R. Civ. P. 56(a). The moving party bears the initial burden of identifying relevant portions of the record that demonstrate the absence of a fact or facts necessary for one or more essential elements of each claim upon which the moving party seeks judgment. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

If the moving party meets its initial burden, the opposing party must then set out specific facts showing a genuine issue for trial in order to defeat the motion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); see also Fed. R. Civ. P. 56(c), (e). The nonmoving party must not simply rely on the pleadings and must do more than make “conclusory allegations [in] an affidavit.” Lujan v. Nat’l Wildlife Fed’n, 497 U.S. 871, 888 (1990); see also Celotex, 477 U.S. at 324. Summary judgment must be granted for the moving party if the nonmoving party “fails to make a showing sufficient to establish the existence of an element essential to that party’s case, and on which that party will bear the burden of proof at trial.” Id. at 322; see also Abromson v. Am. Pac. Corp., 114 F.3d 898, 902 (9th Cir. 1997).

In light of the facts presented by the nonmoving party, along with any undisputed facts, the Court must decide whether the moving party is entitled to judgment as a matter of law. See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass’n, 809 F.2d 626, 631 & n.3 (9th Cir. 1987). When deciding a motion for summary judgment, “the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion.” Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted); Valley Nat’l Bank of Ariz. v. A.E. Rouse & Co., 121 F.3d 1332, 1335 (9th Cir. 1997). Summary judgment for the moving party is proper when a rational trier of fact would not be able to find for the nonmoving party on the claims at issue. See Matsushita, 475 U.S. at 587.

## IV. DISCUSSION

The government argues that it is entitled to summary judgment because the undisputed facts demonstrate that plaintiff was (1) a “responsible person” for purposes of 26 U.S.C. section 6672, who (2) “willfully failed” to pay Micro Capital’s payroll taxes.

Plaintiff contends, to the contrary, that genuine issues of material fact exist as to these two issues.

The Internal Revenue Code requires employers to withhold federal social security and individual income taxes from their employees' wages. Davis v. United States, 961 F.2d 867, 869 (9th Cir. 1992) (citing 26 U.S.C. §§ 3102(a) and 3402(a)). Employers collect these tax amounts each salary period, but pay them to the IRS on a quarterly basis. In the interim, the employer holds the collected taxes in trust for the United States. Davis, 961 F.2d at 869. If an employer ultimately fails to pay over the collected taxes, the government still credits the employees with the payment. Accordingly, to protect against revenue losses, the tax code provides the United States a variety of ways to recover the taxes from the employer. Id. (citing Slodov v. United States, 436 U.S. 238, 243 (1978), and 26 U.S.C. §§ 6321, 6672, 7202, and 7215).

In particular, section 6672 provides that

> Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

26 U.S.C. § 6672(a). Liability under section 6672 is thus composed of two elements: (1) that the taxpayer was a "responsible person" who (2) "willfully failed" to collect, account for, or pay over such taxes. See United States v. Sabaratnam, No. 14-CV-04504-SJO-RZ, 2015 WL 6667765, at *12 (C.D. Cal. Sept. 8, 2015), aff'd, 683 F. App'x 614 (9th Cir. 2017). "A taxpayer may establish that an assessment or determination is without foundation by establishing that he (1) is not a responsible person (i.e., the party required to collect, truthfully account for, and pay over the tax), and (2) did not willfully refuse to pay the tax." See id.

As indicated, plaintiff contests both that he was a "responsible person" and that he "willfully failed" to account for or pay the employment taxes for the periods at issue.

**A. Whether Plaintiff Is a "Responsible Person"**

Under section 6672, a responsible person is anyone "required to collect, truthfully account for, and pay over" the trust fund taxes. In the Ninth Circuit, "responsibility is a matter of status, duty, and authority." Purcell v. United States, 1 F.3d 932, 937 (9th Cir. 1993) (internal quotation marks omitted). An individual is therefore a responsible person if he "had the authority required to exercise significant control over the corporation's financial affairs, regardless of whether he exercised such control in fact." Id.

"That an individual's day-to-day function in a given enterprise is unconnected to financial decision making or tax matters is irrelevant where that individual has the authority to pay or to order the payment of delinquent taxes." Purcell, 1 F.3d at 937 (citing Denbo v. United States, 988 F.2d 1029, 1033 (10th Cir.1993); Bowlen v. United States, 956 F.2d 723, 728 (7th Cir.1992); McDermitt v. United States, 954 F.2d 1245, 1251 (6th Cir. 1992)); see also United States v. Jones, 33 F.3d 1137, 1140 (9th Cir. 1994). Instead, "[c]ourts must look beyond official titles to the actual decision-making process." Jones, 33 F.3d at 1140 (citation omitted). "[A]n individual may be said to have had the final word as to what bills should or should not be paid if [the] individual had the authority required to exercise significant control over the corporation's financial affairs, regardless of whether he exercised such control in fact." Purcell, 1 F.3d at 937 (quotation marks omitted). Authority that "permits control," in turn, "carries with it a nondelegable duty to ensure that withholding taxes are duly collected and paid over to the government." Id.

The government contends that plaintiff had a "significant ownership interest" in Micro Capital, that he was physically present on a monthly basis, kept in contact with other executives, participated in major decisions, provided money to Micro Capital, and guaranteed payment of its receivables. MSJ at 11 (citing Cassidento v. United States, No. CIV. H-86-736 TEC, 1990 WL 54850, at *2 (D. Conn. Feb. 23, 1990) (finding that 50% owner and officer of a corporation, who did not maintain an office or adhere to a regular work schedule but participated in major decisions regarding the corporation and loaned the corporation money was a "responsible person" under section 6672). Moreover, the government argues that plaintiff "admits that he had the power to control how Micro Capital resolved its unpaid employment tax liabilities," and it argues that even if plaintiff did not actually sign checks or manage day-to-day operations, he had the authority to exercise significant control over the financial affairs of Micro Capital. Id. In light of

these facts, the government asserts that plaintiff was a "responsible person" during the periods at issue and was properly held liable for the TFRP.

In opposition, plaintiff argues that "ownership interest is not enough to make a finding that someone is a responsible person for purposes of the TFRP," and contends that (1) plaintiff was not an officer or on the board of directors of Micro Capital; (2) plaintiff owned a minority interest in the company; (3) plaintiff was not active in the day-to-day affairs of the company; (4) plaintiff had "some power" to hire or fire, but only insofar as his ownership was in conjunction with Pantaleo's 44% interest; (5) plaintiff did not make decisions regarding which, when, and in what order outstanding debts or taxes would be paid; (6) plaintiff did not exercise control over daily bank accounts; and (7) plaintiff had unexercised check-signing authority. Opp'n at 9. Accordingly, plaintiff contends that he was not a "responsible person" vis-à-vis Micro Capital. Id.

In particular, plaintiff asserts that, as a passive investor, his "lack of active participation in Micro Capital" and reliance upon executives to handle the corporate financial affairs means that plaintiff is not a "responsible person" for purposes of section 6672. Id. at 9–10 (citing Elliot v. United States, 1991 U.S. Dist. LEXIS 72296 (D. Mo. 1991) (concluding that an employee and 39% shareholder who had the authority to direct payment of corporation's debts but did not do so because of his eighth grade education was not a responsible person for TFRP purposes); McDermitt v. United States, 954 F.2d 1245 (6th Cir. 1992) (concluding that appellant—who was not an officer of the corporation—was "in every sense the boss" and had the power and authority to direct payment and non-payment of the corporation's liabilities, and holding that appellant was a responsible person under the TFRP); In re Derickson, 104 B.R. 346 (Bankr. D. Or. 1989) (concluding that debtor did not exercise influence or control over day-to-day financial affairs of respective corporations, and that because he did not direct or control payment of corporate funds or decide which bills should be paid, debtor was not a responsible person under section 6672); (O'Connor v. United States, 956 F.2d 48 (4th Cir. 1992) (reasoning that because appellant did not perform duties an officer might perform and did not exercise his authority as an equity holder and vice president, appellant was little more than a passive investor who neither exercised authority nor had a duty to exercise authority); (Vinick v. United States, 205 F.3d 1 (1st Cir. 2000) (concluding that because appellant was a passive investor in the corporation, and because he did not possess actual, exercised authority over the company's financial matters, appellant was not a responsible person under section 6672); In re Barnett, 387 B.R. 698 (Bankr. D. Va. 2008) (noting that a debtor's interest in paying off delinquent trust fund

taxes does not necessarily reflect control over payroll, and concluding that the debtor was not a responsible person under section 6672 because he did not control company payroll, did not determine which creditors to pay and in what order, and did not participate in day-to-day management). Plaintiff argues that he invested in Micro Capital for "passive income," that he did not participate in corporate affairs, did not control company payroll, did not determine what creditors to pay, and did not exercise his titular authority as minority owner. Opp'n at 11–13. Accordingly, plaintiff contends that there are "material factual disputes" that control the determination of whether he is a "responsible person" for purposes of section 6672.

In reply, the government reiterates that plaintiff had check-signing authority, had the power to hire and fire employees, and that he admits that he had the power to tell employees of Micro Capital which creditors to pay. Reply at 2.

The Court concludes that triable issues of material fact exist regarding whether plaintiff was a "responsible person" for purposes of section 6672. The Ninth Circuit in Purcell observed that persons "responsible" for payment of withholding taxes are those who "had the *final word* as to what bills should or should not be paid, and when." Purcell, 1 F.3d 932 at 936 (emphasis added). The court went on to "conclude that an individual may be said to have had the final word as to what bills should or should not be paid if such individual had the authority required to exercise significant control over the corporation's financial affairs, regardless of whether he exercised such control in fact." Id. at 937. In support of its holding that there was "no question" that the appellant qualified as a "responsible person," the Ninth Circuit reasoned that the appellant was the corporation's "president, its sole shareholder, and the only authorized signatory on its checking account." Id.

The record here does not definitively reflect whether plaintiff had "the final word" as to what bills should or should not be paid, and it does not conclusively demonstrate whether plaintiff had significant control over Micro Capital's financial affairs. Unlike the majority shareholder appellant in Purcell who was held to be a "responsible person," plaintiff was a *minority* shareholder and was not the president of Micro Capital. See id. Moreover, plaintiff's primary role with respect to Micro Capital was helping with sales and marketing and, on occasion, meeting with clients or potential clients in Phoenix. PSF at no. 86. It appears that Pantaleo was the one "actively involved" in managing Micro Capital, and Pantaleo—along with Miller and Arvizu—were the three individuals who dealt with the financial and tax information concerning the company. See PSF at nos.

90–91, 114. The record further demonstrates that plaintiff's knowledge concerning Micro Capital's business was limited to monthly verbal or written reports from Pantaleo. Id. at no. 95.

On the other hand, the record also demonstrates that plaintiff signed the applications for three Wells Fargo Bank business accounts for Micro Capital, and that plaintiff had signature authority for each of these bank accounts. DSUF at nos. 9–21. In addition, plaintiff guaranteed payment for Micro Capital's receivables to Rexford. Id. at 23.

At oral argument, counsel for the government argued that the undisputed facts reflect that plaintiff admitted that he "had the power to tell employees of Micro Capital Limited Partnership which creditors to pay," and that if plaintiff had been actively running Micro Capital, "the employment taxes would have been paid to the IRS." DSUF nos. 16; 57. Yet, significantly, it is inconclusive at this juncture whether plaintiff actually admitted that he "had the power" to control what was going to be done in response to the tax liabilities, and whether he in fact had "significant power" over Micro Capital's finances. Ireland Depo at 37:17-19. Plaintiff's deposition testimony reflects that, in response to whether he "had the power to control what was going to be done," plaintiff answered that he "had the power." See id. Nonetheless, plaintiff revised his answer to state that "I had 44% of the power and 44% control on what was going to be done; I did not have sole power to control anything." See 22–6 & Ex. E. In addition, subsequent to this answer, the following exchange ensued:

Question: Okay. And if you had told [the executives] to stop paying any other creditors besides the IRS, they would have done that; right?

Answer: Not necessarily.

Question: Why not?

Answer: Because [Pantaleo] was there as well. [Pantaleo] was actively involved in the business. So [the executives] knew [Pantaleo] on a regular basis. Meetings, conferences, whatever activities of the company was occurring. [Pantaleo] was readily available. So if I said something that one of the executives might disagree with or not like, I believe that they would go straight to [Pantaleo], if they don't – if they haven't already talked to [Pantaleo] about it first. Okay? Because,

> again, he was—he was intimately involved in the day-to-day operations of the company.

Id. at 37:20-38:9. Accordingly, viewing the evidence in the light most favorable to plaintiff—as is required at this juncture—the record demonstrates a triable issue of material fact regarding whether plaintiff had the "final word as to what bills should or should not be paid," and thus whether he had the authority to exercise "significant control" over Micro Capital's financial affairs. See Purcell, 1 F.3d at 937.

The Ninth Circuit has also considered various factors, none of which is alone determinative, in deciding whether an individual is a responsible person for purposes of section 6672. An individual is more likely to be found responsible if he (1) holds corporate office; (2) has check-signing authority; (3) can hire and fire employees; (4) manages the day-to-day operations of the business; (5) prepares payroll tax returns; (6) signs financing contracts; and (7) determines financial policy. See United States v. Jones, 33 F.3d 1137, 1141 (9th Cir. 1994); Jordan v. United States, 359 F. App'x 881, 882 (9th Cir. 2002).

In consideration of these seven factors, the Court finds no reason to depart from the conclusion that a triable issue of material fact exists as to whether defendant is a "responsible person" for purposes of section 6672. Plaintiff did not hold corporate office—as he was not an officer and was not on the board of directors of Micro Capital—and he did not manage the day-to-day operations, did not prepare payroll tax returns, and the record does not demonstrate that he determined financial policy in any significant way. Although the record does indicate that plaintiff had unexercised check-signing authority,[6] that he had the power to hire and fire employees, and that he guaranteed payment of receivables to Rexford, these factors are not alone determinative, particularly when the Court is obligated to draw inferences in plaintiff's favor. Moreover, it does not appear that plaintiff had the "final word" to control how Micro Capital should spend its corporate funds to resolve outstanding liabilities. To the contrary, the record evidences that plaintiff provided his own *personal* funds to resolve the tax liabilities at issue. With

---

[6] It is not clear from the record whether plaintiff was the "*only* authorized signatory" on Micro Capital's checking account, a fact that stands in contrast to the appellant in Purcell, who was the "only authorized signatory" on the corporation's checking account. See Purcell, 1 F.3d at 937 (emphasis added).

respect to these funds, plaintiff clarified in his revised deposition testimony the following:

> Question: If you had ordered that the IRS be paid, what would have happened?
>
> [Revised] Answer: I would assume that [the executives] would listen to my instructions because the monies that were given to them by me were not the company's money but mine. I acted beyond the responsibility as a 44% owner by giving them money to pay for these liabilities including the taxes thus I did have the authority, in this case, to dictate how my money was going to be spent.

See Ireland Depo. at 38:10–11; Dkt. 22–6 & Ex. E. Though plaintiff believed that he had the authority to dictate how his personally-loaned funds should be spent, this testimony nonetheless demonstrates a genuine issue as to whether plaintiff had the corporate authority to make final decisions regarding which, when, and in what order outstanding debts or taxes would be paid, particularly because the record reflects that the executives did not follow his orders to pay the tax liabilities with this loaned money. Accordingly, on balance, the aforementioned factors demonstrate a triable issue of material fact as to whether plaintiff is a "responsible person" for purposes of section 6672, and the Court concludes that whether plaintiff had the "final word" as to what bills should be paid, and when, is a matter better suited for a jury.

### B. Whether Plaintiff "Willfully Failed" to Collect Micro Capital's Payroll Taxes

A "responsible person" is liable for the TFRP if he "willfully fails" to comply with his duties under section 6672. See 26 U.S.C. § 6672(a). "Willfulness," for purposes of section 6672, means "a voluntary, conscious and intentional act to prefer other creditors over the United States." Nakano v. United States, 742 F.3d 1208, 1211 (9th Cir. 2014). Thus, "[i]f a responsible person knows that withholding taxes are delinquent, and uses corporate funds to pay other expenses, even to meet the payroll out of personal funds he lends the corporation, our precedents require that the failure to pay withholding taxes be deemed 'willful.' " Phillips v. U.S. I.R.S., 73 F.3d 939, 942 (9th Cir. 1996). "No bad motive need be proved, and conduct motivated by reasonable cause, such as meeting the payroll, may be 'willful.' " Id. Reckless disregard of whether taxes are being paid over

may suffice. See id. "But the Government must prove more than mere negligence." Id. (quoting Klotz v. United States, 602 F.2d 920, 924 (9th Cir. 1979)).

Because the Court determines that there is a genuine issue as to whether plaintiff is a responsible person—i.e. whether he had authority to prefer certain creditors over the United States—the Court necessarily finds a genuine issue as to whether plaintiff willfully preferred such creditors.[7]

Accordingly, the Court **DENIES** the government's motion for summary judgment.

## V. CONCLUSION

In accordance with the foregoing, the Court **DENIES** the government's motion for summary judgment.

IT IS SO ORDERED.

: 11

Initials of Preparer JLO

[7] At oral argument, plaintiff's counsel argued that the government conceded the issue of willfulness in its reply brief, and requested the Court sua sponte to enter summary judgment. The Court declines to enter summary judgment for plaintiff, as the question of willfulness is an issue of fact better resolved by a jury.